IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 05-439 |
| KENNETH H. WATERSTRADT | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, Patrick L. Meehan, United States Attorney for the Eastern District of Pennsylvania, and Louis D. Lappen, Assistant United States Attorney for the district, submits the following sentencing memorandum.

**I.      INTRODUCTION**

On August 30, 2005, the defendant pleaded guilty to a one-count Information charging him with one count of transporting a minor in interstate commerce with intent that the minor engage in illegal sexual activity, in violation of 18 U.S.C. § 2423(a).  This case arose from the defendant's having arranged and paid for the transportation for a 15-year old girl to travel from Los Angeles, California to Philadelphia, Pennsylvania to engage in illegal sexual activity with the defendant.  A sentencing hearing is scheduled in this case for December 6, 2005.

**II.     FACTUAL BACKGROUND**

On Thursday, June 2, 2005, a 15 year-old girl, known to the government and identified here and in the information as S.S., was living in Barstow, California.  That evening, S.S. did not return to her home after school as her parents (mother and stepfather)

had expected. Her parents then observed that all of their daughter's clothes were removed from her room, so they called the Barstow Police Department and reported S.S. missing. Her parents told the police that their daughter had developed a relationship with an older man named Ken Waterstradt who was telephoning the house frequently. They said that Waterstradt had sent roses, chocolates, and a teddy bear to S.S. and that originally they thought he was a teenager. The parents said that Waterstradt had also bought S.S. a cellular telephone to use to speak with him and that Waterstradt and S.S. were constantly talking to each other on the telephone.

Law enforcement agents from the police department and the FBI ("the agents") then began to investigate the matter. With the parents' permission, the agents searched S.S.'s computer. The search revealed an on-line correspondence between S.S. and the defendant, Kenneth H. Waterstradt, in which the two professed their love for one another and suggested that when S.S. turned 18 they could get married. One email from Waterstradt to S.S. included a photographic attachment depicting what purported to be Waterstradt's genitals.

Agents then investigated airline records and determined that on June 2, 2005, S.S. traveled on a Southwest Airlines flight from Los Angeles, California to Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania. Southwest Airlines records showed that S.S. traveled on a one-way ticket that was purchased on May 13, 2005, with a Commerce Bank Visa debit card issued to the defendant. Agents then investigated Waterstradt's Visa records and determined that the debit card was also used to

purchase limousine service in Victorville, California for a trip from the Victorville area (which is near S.S.'s home in Barstow) to the airport in Los Angeles.

Upon investigating further the activity on the debit card, agents determined that on June 3, 2005, at approximately 10:00 a.m., the debit card was used at the Super 8 Motel at 1015 Pulaski Highway, Joppa, Maryland. The card also had been used a few hours earlier at an ATM in Bear, Delaware. Based on this information, the government obtained a complaint and arrest warrant for the defendant.

In the afternoon of June 3, 2005, FBI Special Agents and Maryland State Police Troopers traveled to the Super 8 Motel in Joppa, Maryland and coincidentally, spotted Waterstradt exiting the motel by himself and entering a vehicle. They approached Waterstradt and asked him to identify himself, which he did. They asked him what room he was staying in and whether he was with anyone. Waterstradt said that he was in Room 127 and that he was with "a girl." The officers then arrested Waterstradt on the complaint and warrant and transported him to the Bel Air Barracks of the Maryland State Police.

When they arrived at the barracks, FBI Special Agent Troy Breitenbach and Task Force Officer Ronald Ogle advised Waterstradt orally and in writing of his constitutional rights, and Waterstradt waived his rights orally and in writing. The defendant then also consented orally and in writing to a search of his vehicle, his residence, and his motel room. Agents then interviewed Waterstradt who stated, in summary, as follows:

He is a 37 year-old male who is married but recently separated, and is living with his parents in a trailer in Wilmington, Delaware. He has a 17 year-old daughter from his marriage. He met S.S. about 1.5 years ago in an internet chat room called "Airgairdate" which he accessed through his cellular telephone. They started out as "friends," but developed a relationship such that he considers S.S. to be his "girlfriend" and "soulmate." He knows that S.S. is 15 years old. Waterstradt bought S.S. a cellular telephone about eight months ago with service through a Sprint "family plan" so that he could talk to her regularly. Waterstradt and S.S. then used the phone to speak for several hours every night. Their conversations included phone sex, and Waterstradt used the internet service on his telephone to send S.S. a photograph of his erect penis. Waterstradt understood that S.S. had some emotional problems, as she had "a thing with hurting herself when she's in pain." Waterstradt also learned from S.S. that she has suffered repeated sexual abuse at the hands of older men and that, in particular, when she was approximately 12 years old, she was raped by one of her mother's boyfriends.

The defendant said that because he and S.S. wanted to be together, he gave her his Commerce Visa bank card to pay for limousine transportation to the airport and a one-way flight to Philadelphia. Waterstradt intended to take S.S. to Florida and find a way to marry her. On June 2, 2005, Waterstradt picked up S.S. at the Philadelphia International Airport when her flight arrived from California. They began their drive south and, after a failed sexual encounter in the car, they stopped in Maryland at the Super 8 Motel where Waterstradt was later arrested. After purchasing a room, Waterstradt and S.S. engaged in sexual activity. They performed oral sex on each other, which included

4

Waterstradt ejaculating in S.S.'s mouth.  Waterstradt also inserted his finger in S.S.'s vagina.  Waterstradt rubbed his penis against S.S.'s vagina, but he did not insert it. Waterstradt understands that engaging in sexual activity with a 15 year-old girl is illegal and that traveling to another state "compounds the crime."

Back at the Super 8 Motel, agents found the victim, S.S., in the room that Waterstradt had rented.  She was wearing a bathrobe.  Agents telephoned her parents to advise them that they found their daughter and asked the parents' permission to interview her.  The parents consented to the interview.  S.S. told authorities the following:

She met Waterstradt about three years ago when he contacted her via the internet after viewing a Nextel profile of S.S. that she had posted    S.S. told the defendant that she was 13 years old, and he said that he was 35.  After meeting on the internet, Waterstradt and S.S. continued to communicate via the internet and telephone.  S.S. told him that she was suffering from numerous emotional problems.  She said that she was raped when she was nine years old, her mother has cancer and is unemployed, her stepfather does not make much money, and her biological father is a drug addict whom she has not seen for months.  She wanted to get away from her home where she suffers abuse and where she has twice attempted suicide.

S.S. said that she was in love with Waterstradt and wanted to be with him. She has been talking to Waterstradt about leaving California to join him since January. He has bought her numerous gifts, including the cell phone that she uses to communicate with him daily, clothes, cash, and roses.  S.S. confirmed that Waterstradt bought her the Southwest Airlines ticket that she used to fly to Philadelphia, picked her up at the airport

5

for their trip south, and had sex with her as described above. S.S. described an additional aspect of their sexual activity in the Super 8 Motel that included Waterstradt slightly penetrating her vagina with his penis.

After Waterstradt was incarcerated in this case, he corresponded by mail with S.S., again professing his love for her and his desire to be with her. S.S. responded to his letters also expressing her desire to be with the defendant. The defendant also wrote to the victim's mother apologizing for his conduct and expressing his love for her daughter and his intention to marry her. S.S.'s parents then advised the government of Waterstradt's conduct, and the government requested the Honorable Jacob P. Hart to issue an order prohibiting Waterstradt from communicating with S.S. The court issued the order as requested by the government. The government has attached as Exhibit A redacted copies of the letters received from the victim's family and a Victim Impact Statement prepared by the victim's parents concerning this offense and the defendant's post-arrest correspondence with the victim.

### III. SENTENCING CALCULATION

#### A. Statutory Maximum Sentence

The maximum sentence that may be imposed is as follows: 30 years imprisonment, including a mandatory term of five years imprisonment, a five-year period of supervised release, a $250,000 fine, and a $100 special assessment.

#### B. Sentencing Guidelines Calculation

The government agrees with the Sentencing Guideline calculation as set forth in the Presentence Report ("PSR"), which results in a total offense level of 29. With

6

a criminal history category of I, the Guideline range is 87 to 108 months imprisonment. The defendant disputes two of the upward adjustments recommended by the PSR, each of which adds two levels: (1) that under U.S.S.G. § 3A1.1, the defendant knew or should have known that the victim of the offense was a vulnerable victim; and (2) that under U.S.S.G. § 2G1.3(b)(2), the defendant unduly influenced a minor to engage in a prohibited sexual act. The government will address each of these upward adjustments in turn.

U.S.S.G. § 3A1.1 provides that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels." Application Note 2 to this section defines vulnerable victim as one "who is a victim of the offense of conviction" and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." This application note also cautions that the adjustment should not be applied "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline. For example, if the offense guideline provides an enhancement of the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age."

Here, the government is not seeking to apply this enhancement because of the victim's age; that factor already is incorporated in the guideline range for the offense of conviction. Rather, the enhancement should apply because the defendant knew of the defendant's mental condition that rendered her unusually vulnerable to this crime. The defendant has admitted to authorities and this Court that he knew that his victim had been repeatedly sexually abused by older men, that she had a tendency to engage in self

7

mutilation (cutting herself) "when she was in pain," and that she wanted to leave her home in California.  Plainly, the defendant understood that with this history of abuse and self-destruction, his victim was unusually vulnerable to the criminally amorous behavior and sexual advances of an older man.  The defendant offered his victim the fantasy of love and escape -- a fantasy that had enormous appeal to a damaged and desperate young girl.  Thus, because the defendant took advantage of a vulnerable victim, this Court should apply this enhancement.

Next, under U.S.S.G. § 2G1.3(b)(2), this Court should find that the defendant unduly influenced a minor to engage in a prohibited sexual act.  Application Note 4 provides that where the defendant's age is more than 10 years greater than that of the victim, there is a rebuttable presumption of undue influence.  Application Note 1 defines "victim" as "an individual who . . . has not attained that age of 16 years."  In Appendix C to the November 1, 2002 Guidelines, p. 49, the Commission explained that the presumption was created because persons much older than a minor "are frequently in a position to manipulate the minor due to increased knowledge, influence and resources."  See United States v. Root, 296 F.3d 1222, 1232-33 (11th Cir 2002) (applying enhancement based on presumption where much older defendant used his superior knowledge, influence, and resources to attempt to influence an uncertain adolescent to travel to have sex with him).

In the present case, the 37-year-old defendant clearly enticed his 15-year old victim, with whom he developed a relationship when she was only 13, to travel to Philadelphia for sex.  He paid for her limousine to the airport and for her one-way airline

ticket. He made plans for them to travel to Florida where they would live together, far away from and unbeknownst to the victim's parents. The defendant cannot overcome the presumption that he exercised undue influence over this fragile young adolescent girl and thus, this Court should apply the two-level upward adjustment.

  C.  Application of the Sentencing Guidelines to this Case

  In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." <u>Booker</u>, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "unreasonableness." <u>Id.</u> at 765.

  In the wake of <u>Booker</u>, this Court must make a correct calculation under the existing Sentencing Guidelines and then consider the final guideline calculation when determining the sentence to be imposed. As is plainly set forth in <u>Booker</u>, the Guidelines sentence is not to be based solely on facts found by a jury beyond a reasonable doubt. <u>See</u> <u>United States v. Crosby</u>, 397 F.3d 103, 115 (2d Cir. 2005) ("a sentencing judge would . . . violate section 3553(a) by limiting consideration of the applicable Guideline range to the

9

facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range, as required by subsection 3553(a)(4), based on the facts found by the court."); see also United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005) (Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing. The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."). Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 767; see also United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("[t]he applicable Guideline range is normally to be determined in the same manner as before Booker/Fanfan.").1/

---

1/     The courts of appeals have generally stated that the proper sentencing procedure after Booker is for the district court first to calculate the Guidelines sentence and then to consider the other factors listed in 18 U.S.C. § 3553(a). See, e.g., Crosby, 397 F.3d at 111, 112 ("In order to fulfill this statutory duty to "consider" the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range. * * * .  Once an applicable Guidelines range has been determined, the sentencing judge will have the duty, imposed by subsection 3553(a)(4), to 'consider' it, along with all of the factors listed in section 3553(a)."); United States v. Hughes, 396 F.3d 374, 378-79 (4th Cir. 2005) ("Consistent with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the Guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the Guidelines and those factors set forth in § 3553(a) before imposing the sentence."). As noted below, the government submits that the factors in Section 3553(a) have, to a large extent, been taken into account by the Sentencing Commission in its development of the Sentencing Guidelines, and that even a separate accounting of these factors should, in all but the most exceptional case, result in a sentence within the Guideline range. Cf. Mares, 402 F.3d at 519 (noting that if a sentencing judge exercises discretion to impose a sentence within the Guideline range, the appellate court on review "will infer that the judge has considered all the

The Third Circuit has affirmed the trial court's authority, following Booker, to determine the appropriate Guideline range under the preponderance-of-the-evidence standard. In remanding a case for resentencing, where the original sentence had been applied before Booker was decided, the Court stated:

> We . . . note that the District Court is free to engage in precisely the same exercise in judicial fact finding as it did in February 2003, so long as such fact finding is consistent with Booker. Cf. United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir.2005) ("The error is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system.").

United States v. Miller, 2005 WL 1791999, at *4 (3d Cir. July 29, 2005).

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., Booker, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 744 (same) ("Congress' basic statutory goal of diminishing sentencing disparity depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.");

---

factors for a fair sentence set forth in the Guidelines" and it will be "rare" for a reviewing court to say the sentence is unreasonable).

id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of nearly 20 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances. Since Booker, the courts of appeals have emphasized the continued importance of the Sentencing Guidelines. As the Second Circuit Court of Appeals explained in United States v. Crosby,

"These principles change the Guidelines from being mandatory to being advisory, but it is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Crosby, 397 F.3d at 113. The Court of Appeals for the Fifth Circuit also noted in Mares, "Even in the discretionary sentencing system established by Booker/Fanfan, a sentencing court must still carefully consider the detailed statutory scheme created by the [Sentencing Reform Act] and the Guidelines, which are designed to guide the judge toward a fair sentence while avoiding serious sentence disparity." 402 F.3d at 518-19. See also United States v. Paladino, 401 F.3d 471, 480 (7th Cir. 2005) ("Under the new sentencing regime the judge must justify departing from the Guidelines, and the justification has to be reasonable.").

A recent decision of the Seventh Circuit in defining the new sentencing regime is instructive. That court stated:

> The Sentencing Guidelines represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses. When the Supreme Court directed the federal courts to continue using the Guidelines as a source of advice for proper sentences, it expected that many (perhaps most) sentences would continue to reflect the results obtained through an application of the Guidelines. But "many or most" sentences cannot mean "all" sentences. Put differently, Booker does not hold that a Guidelines sentence must conclusively be presumed to be reasonable. . . .
>
> But while a per se or conclusively presumed reasonableness test would undo the Supreme Court's merits analysis in Booker, a clean slate that ignores the proper Guidelines range would be inconsistent with the remedial opinion. As Booker

13

> held, "the district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S.Ct. at 767. The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country. "The Sentencing Commission will continue to collect and study [district court] and appellate court decisionmaking. It will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices." Id. at 766. The best way to express the new balance, in our view, is to acknowledge that any sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness. . . .
>
> The defendant can rebut this presumption only by demonstrating that his or her sentence is unreasonable when measured against the factors set forth in § 3553(a).

United States v. Mykytiuk, 2005 WL 1592956, at *1-2 (7th Cir. July 7, 2005).

The government also commends to the Court's attention the scholarly opinion in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005), which agreed that, absent unusual circumstances, a sentence should be imposed within the Sentencing Guideline range. In his assessment in Wilson, on the day after Booker was decided, Judge Cassell explained at length the reasons supporting this view. As he stated, the Guidelines represent the product of an expert commission, which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences which carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to Congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the

14

Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912.2/

The United States submits that a sentence within the guideline range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. As the Fifth Circuit stated in Mares,

> If the sentencing judge exercises her discretion to impose a sentence within a properly calculated Guideline range, in our reasonableness review we will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines. Given the deference due the sentencing judge's discretion under the Booker/Fanfan regime, it will be rare for a reviewing court to say such a sentence is "unreasonable."

402 F.3d at 519. The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate. Cf. id. (noting that "[w]hen the judge exercises her discretion to impose a sentence within the Guideline range and states for the record that she is doing so, little explanation is required," but when the judge gives a non-Guideline sentence, "she should

---

2/ In United States v. Ranum, 353 F. Supp. 2d 984 (E.D. Wis. 2005), Judge Adelman rejected Judge Cassell's approach, claiming that it is "inconsistent" with the holdings in Booker. The government respectfully disagrees with Judge Adelman's approach. As Judge Cassell noted in a subsequent opinion in United States v. Wilson, 355 F. Supp. 2d 1269 (D. Utah 2005), the Ranum approach ignores the "carefully calibrated" work of the Commission in determining which offender characteristics determine a sentence. Id. at 1275. Moreover, Ranum gives insufficient consideration to the importance of consistent sentencing and avoiding sentencing disparities. As Judge Cassell recognized, "only close adherence to the Guidelines offers any prospect of treating similarly-situated offenders equally," and thus assuring fidelity to the manifest Congressional purpose. Id. Moreover, the opinion of the Wisconsin court appears inconsistent with later decisions of its governing Court of Appeals, the Seventh Circuit, as noted above.

15

carefully articulate the reasons she concludes that the sentence she has selected is appropriate for that defendant" because "[s]uch reasons are essential to permit this court to review the sentence for reasonableness as directed by Booker.").

### III. GOVERNMENT'S RECOMMENDATION

With a total offense level of 29 and a criminal history category of I, the applicable Guideline range is 87 to 108 months imprisonment. No unusual circumstances exist which warrant an exception to the preference for Guideline sentencing. The factors under 18 U.S.C. § 3553(a) call for a Guidelines sentence. A Guidelines sentence will reflect the serious criminality of an older man luring a young girl across state lines to engage in illegal sexual activity. Such a sentence will also promote respect for the law and deter potential criminals from committing these dangerous offenses that exploit the vulnerabilities of young adolescents. Likewise, a Guidelines sentence will adequately punish the defendant and help protect the public from further exploitation of children.

For all of the above reasons, the government respectfully recommends that this Court impose a period of incarceration within the Guideline range of 87 to 108 months imprisonment.

Respectfully submitted,

**PATRICK L. MEEHAN**
**United States Attorney**

_____

**LOUIS D. LAPPEN**
**Assistant United States Attorney**

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing Government's Sentencing Memorandum to be served by First Class United States Mail upon counsel for defendant:

> Brendan T. McGuigan
> 42 South 15th Street
> Suite 1313
> Philadelphia, PA 19102

_____
Louis D. Lappen
Assistant United States Attorney

Date: November 30, 2005